JOHN DOE,

      Plaintiff,

v.

BOARD OF REGENTS OF THE UNIVERSITY OF
WISCONSIN SYSTEM; UNIVERSITY OF
WISCONSIN-MILWAUKEE; NELIDA CORTES,
in her official capacity; JAMIE CIMPL-WIEMER, in
her official capacity; and JOHANNES BRITZ, in his
official capacity,

      Defendants.

Case No.

Plaintiff, John Doe ("Plaintiff" or "John Doe") by his attorneys Friebert, Finerty & St. John, S.C. and Warshaw Burstein LLP, sues Defendants, BOARD OF REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM, UNIVERSITY OF WISCONSIN-MILWAUKEE, NELIDA CORTES, in her official capacity, JAMIE CIMPL-WIEMER, in her official capacity, and JOHANNES BRITZ, in his official capacity (hereinafter collectively referred to as "Defendants"), and seeks declaratory and permanent injunctive relief against Defendants, and any other and further relief that this Court deems just and proper, and states as follows:

## NATURE OF ACTION

1.      John Doe is a tenured professor at an educational institution in Texas. Jane Doe was a Ph.D. student at the University of Wisconsin Milwaukee (the "University") from 2009 to 2015. In 2011, John Doe and Jane Doe met at a local bar in downtown West Virginia. John and Jane were in West Virginia attending an industry conference for the North American Nanohertz Observatory for Gravitational Waves ("NANOGrav"), of which they were both members. John and Jane had a connection and, upon Jane's initiation, she followed John back to his hotel room to

engage in consensual intercourse. Following their first night of intimacy, John and Jane were inseparable, and spent approximately six nights together during the ten-day conference.

2.    In June 2011, Jane suggested that they have a "no strings attached" (NSA) romantic relationship and John agreed. John and Jane continued their NSA relationship for almost 2 years. Their relationship was witnessed by several members of NANOGrav and heavily documented in text messages.

3.    John had no supervisory or any other control over Jane at her University or in NANOGrav.

4.    Beginning in 2012-2013, Jane expressed her interest in taking their NSA relationship to the "next level." However, John expressed his resistance to taking the relationship to the next level. As a result, Jane met someone else and the NSA relationship dissolved in early 2013.

5.    In 2016, almost five years after their relationship began, NANOGrav commenced an investigation into Jane's complaint of sexual assault and sexual harassment against John to NANOGrav. While Jane's complaint was allegedly dated October 19, 2014, she did not submit her complaint to NANOGrav until March 2016. Jane alleged that she had not consented to sexual intercourse on the first night she met John in West Virginia, and that their almost two-year relationship was without her consent. While NANOGrav lacked any policies to address complaints of sexual assault, it undertook an investigation anyway. NANOGrav issued a defamatory report conveying John's alleged guilt of the allegations, despite the lack of evidence of any assault, and the abundance of evidence corroborating Jane's consent for the almost two-year relationship.

6.     Subsequently, the University was alerted to Jane's complaint through an undisclosed third-party report.  By the time the University received the complaint, however, Jane was no longer a Ph.D. student there.  John Doe is not affiliated or associated with the University in any way, and has absolutely no presence in the State of Wisconsin.  Nevertheless, in violation of constitutional due process and its own policies, the University wrongfully initiated a disciplinary process anyway.  Leading a biased investigation, the University intentionally ignored exculpatory evidence of Jane's contemporaneous admissions of consent for their first night of intimacy, and her initiative to take their almost two-year relationship to the next level.  The University found John "responsible" of sexual assault and sexual harassment.

7.     As a result of Defendants' unlawful exercise of jurisdiction over John Doe and these erroneous findings, John has been shunned by NANOGrav, isolated from research, and is being threatened with ejectment if the "findings" are not overturned. John Doe's alienation from NANOGrav compromises his ability to meaningfully participate in the collaboration as he did before.

8.     In addition, the University impermissibly reported the existence of its extra-judicial and unlawful invocation of jurisdiction over John Doe and the improper charges to John Doe's employer, which caused his employer to request the outcome of the University's investigation, and all reports submitted therein. John's employment has been compromised; he has lost privileges, staff and research project rights. John's continued employment is in jeopardy.

9.     John Doe has sustained tremendous reputational and financial damages as a result of the University's actions.  John has been deprived of various professional opportunities because of the erroneous findings.  John Doe's salary is largely supplemented through various grants and awards from research institutions.  As a result of the erroneous findings, John's ability to secure

3

funding from a $1,000,000 sub-award from the University has been completely undermined, which would have included at least three months of summer salary valued at $24,000. Other future grants from the National Science Foundation, which would have included two months of summer salary for the rest of John Doe's active career, valued at $600,000, have similarly been compromised.

## PARTIES

10.     John Doe is a natural person, citizen of the United States, and resident of Brownsville, Texas. At all times relevant hereto, John Doe was and is a tenured professor at a university in Texas.

11.     Defendant, Board of Regents of the University of Wisconsin System ("Board"), is an administrative agency of the state of Wisconsin that was created pursuant to Wis. Stat. Ch. 36. The Board's headquarters are located at 1860 Van Hise Hall, 1220 Linden Drive in Madison, Wisconsin.

12.     Defendant, University of Wisconsin-Milwaukee (the "University"), is a public urban research university located in Milwaukee, Wisconsin, acting under the authority of the Board. The University's headquarters are located at 3320-3346 North Maryland Avenue, Milwaukee, WI 53211.

13.     Defendant, Nelida Cortes ("Cortes") is an individual over the age of 18 years, who, upon information and belief, is a resident of Milwaukee County, Wisconsin, and who conducts business in Milwaukee County, Wisconsin. At all times relevant hereto, Cortes was UWM's Interim Director of the Office of Equity and Diversity Services ("EDS"). John Doe sues Cortes in her official capacity.

14.     Defendant, Jamie Cimpl-Wiemer ("Wiemer") is an individual over the age of 18 years, who, upon information and belief, is a resident of Milwaukee County, Wisconsin, and who

conducts business in Milwaukee County, Wisconsin. At all times relevant hereto, Wiemer was UWM's Assistant Director of EDS. John Doe sues Wiemer in her official capacity.

15. Defendant, Johannes Britz ("Britz") is an individual over the age of 18 years, who, upon information and belief, is a resident of Milwaukee County, Wisconsin, and who conducts business in Milwaukee County, Wisconsin. At all times relevant hereto, Britz was the Provost and Vice Chancellor for Academic Affairs at UWM. John Doe sues Britz in his official capacity.

16. John Doe, the Board, the University, Cortes, Wiemer, and Britz are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION

17. This is an action for declaratory and injunctive relief.

18. John Doe brings this action pursuant to 42 U.S.C. § 1983 for violations of civil rights under the Fourteenth Amendment to the United States Constitution.

19. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 2201.

20. In accordance with Wis. Stat. §§ 893.82 and 893.80, *et seq.*, John Doe provided written notice to the Attorney General of Wisconsin, as well as the Chancellor of the University, Mark Mone, of his claims within one hundred and twenty (120) days of their accrual, and said claims have not been resolved. John Doe has fully complied with all requirements therein, including the appropriate methods of service.

21. This Court has jurisdiction over Defendants because Defendants are residents of Wisconsin, conduct business in Wisconsin, and committed the acts or omissions giving rise to John Doe's claims in Wisconsin.

22. All conditions precedent to the filing of this action have occurred, accrued, or been waived as a matter of law.

5

<u>**VENUE**</u>

23.     Pursuant to 28 U.S.C. § 1391, venue for this action properly lies in the U.S. Court for the Eastern District of Wisconsin because: (a) the individual Defendants reside in this District, (b) a substantial part of the events or omissions giving rise to the claims occurred in Milwaukee County and (c) the Board and the University does substantial business in Milwaukee County.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

**I.     <u>John and Jane's Participation in NANOGrav.</u>**

24.     NANOGrav is a collaboration of North American researchers engaged in using radio telescopes to detect and study gravitational waves.  In 2011, NANOGrav was a loose collaboration.  No official membership, membership benefits, or management structure were defined. NANOGrav's bylaws were not drafted and adopted until August 2012.

25.     NANOGrav regularly holds conferences among its collaborators, throughout the country and the world, to facilitate and exchange research and ideas.

26.     John Doe is a co-founder of NANOGrav and has been an active member of the collaboration for over ten years.

27.     In 2013 to 2014, John Doe served as Chair of NANOGrav, but has not held a leadership position in the collaboration ever since.

28.     He is held in exceptionally high regard in the physics community, has an expansive resume of accomplishments, articles, and grants, and has always been in good standing with his employer, a university in Texas.

29.     In 2012, Jane Doe became a member of NANOGrav. Jane Doe is presently still a member today.

30.     In 2011, NANOGrav had no formal bylaws and no policies on sexual harassment.

6

31.     In 2011, it was commonplace for members of NANOGrav to engage in social drinking and participant-to-participant romantic relationships, including between professors and students.

32.     NANOGrav did not maintain any guidelines or policies related to: (i) the distinction between junior and senior members, or the significance thereof; (ii) NANOGrav's authority to investigate reports of sexual misconduct; (iii) NANOGrav's adjudication process for reports of sexual misconduct; or (iv) the potential sanctions or actions resulting from an adverse finding of sexual misconduct.

**II.     John and Jane's Consensual, Two-Year Relationship.**

34.     Between June 6, 2011 and June 17, 2011, John and Jane attended a conference for NANOGrav in Morgantown, West Virginia (the "Conference").

35.     One evening during the Conference, John and Jane met at a hotel bar in downtown West Virginia. Numerous NANOGrav members were at the hotel bar, including students and professors.

36.     Sitting together at the hotel bar, Jane presented herself as a daring and sexually adventurous woman. Jane solicited John Doe's thoughts on sex and a "no strings attached" (NSA) relationship. John was intrigued by and interested in Jane's openness and forward nature.

37.     At the time of her solicitation, Jane Doe was openly dating someone else in Milwaukee, Wisconsin.

38.     Other NANOGrav members observed them laughing, flirting, and touching, on this occasion and others.  It was clear to all observers that John Doe and Jane Doe were fond of each other and that intimacy would likely follow.

7

39.     One of the observers included a professor at the University, who was also NANOGrav's Chair during the relevant period ("Witness 1"). Another observer was a professor at a university in Virginia ("Witness 2").

40.     Witness 1 and Witness 2 saw nothing wrong with the interaction and did nothing to intervene.

41.     After some time, Jane Doe said "let's go," grabbed John Doe's hand, and led him to the hotel elevators.

42.     Upon Jane's suggestion, Jane and John went back to John's hotel room that night seeking privacy to engage in consensual intercourse because Jane said she had a roommate in her hotel room.

43.     They proceeded to engage in sexual intercourse in John Doe's hotel room. They engaged in intercourse using numerous sexual positions, including with Jane Doe "on top." She was awake the entire time, alert, and her physical actions clearly conveyed her desire to engage in sexual intercourse with John Doe.

44.     The next day, Jane Doe excitedly shared this account with her friend and roommate at the conference, an undergraduate student at a university in Texas ("Witness 3"). In fact, the two bumped into John Doe the next day, and Witness 3 observed a hickey on John Doe's neck, clearly caused by Jane Doe.

45.     Following their first night of intimacy, John and Jane were inseparable, and spent approximately six other nights together during the ten-day conference. John and Jane engaged in sexual intercourse each of the six other nights they were together.

46.     In June 2011, Jane suggested that they start an NSA romantic relationship and John agreed. John and Jane continued their NSA relationship for nearly two years. Their

8

relationship was witnessed by several members of NANOGrav and heavily documented in text messages.

47.     Days after the Conference concluded, Jane sent numerous text messages to Witness 3 describing her longing and desire to see John again: "I wish I had a chance to talk to [John];" "So do you see him every day in the summer;" "I somehow thought I could do the whole thing nsa [no strings attached] and have no feelings for him, but it's not true;" "I want to see [John] again;" "he has been on my mind SO much this week;" "I keep wondering if hes thought about me at all."

48.     Jane sent numerous messages to Witness 3 conveying her enthusiasm about John and desire to continue seeing John.  Jane never conveyed that she believed she was the victim of sexual assault.

49.     Jane and John continued their consensual NSA relationship at other subsequent NANOGrav conferences.  They continued in this fashion for nearly two years.

50.     During their relationship, Jane would confide in John about her emotional problems and even thanked him for being there for her in dire times of need.

51.     Beginning in 2012-2013, Jane expressed her interest in taking their NSA relationship to the "next level."

52.     On one occasion, Jane texted John: "wish you were coming out with us, and "you still need to come to Milwaukee" where she would "take good care" of him.  "If you come give a talk in Milwaukee I can guarantee you get some snuggling;" "Or invite me to your awesome place in [Texas] to give a talk;" "wanna join us for dinner tomorrow though? You could meet my nerdy family;" "I don't necessarily want something that just revolves around sex."

53.     However, John expressed his resistance to have a more serious relationship with Jane Doe.

54.     John and Jane's relationship ended on February 13, 2013, as a result of John Doe's resistance to take things to the "next level." Jane messaged John, "I have a boyfriend again. I'm kinda serious with him so I think most of my flirting might be gone;" "hope that's ok, sorry, you and I had an interesting time though."

## III.     Jane Doe's Jealous Boyfriend Wanted to "Re-Write" her Sexual Past.

55.     Upon information and belief, Jane's boyfriend was aware of Jane's sexual past, including with John, and was not happy about it. This created a source of tension for Jane and her boyfriend.

56.     Jane confided in Witness 3 about all of the arguments Jane had with her boyfriend about her sexual past, his inability to accept it, and the mental and emotional distress that it had caused her.

57.     On July 27, 2013, Jane texted Witness 3: "He's got a problem where he gets mad about my past, and I get upset bc there is nothing that I can do to change it, and bc I've spent so many months trying to have compassion for myself regarding mistakes I've made and when he can't have that compassion it makes me feel awful and really depressed. I have really come a long way in fixing my mental health but last night was a total meltdown."

58.     Again, on September 6, 2013, Jane told Witness 3 about her boyfriend's angry reaction upon discovering love letters between Jane Doe and a high school boyfriend.

59.     In Facebook messages on November 25, 2013, Jane told Witness 3: "I feel like everything I do is used against me. He reads things into everything. If I put up a photo he thinks I'm trying to make a statement with, if I have photos of these guys from my past he doesn't like,

etc. I am fucking sick of it." And, "yeah, I'd love it if from my past from *before we even met* could stop being an issue."

60.     A few weeks later, on December 9, 2013, Jane Doe messaged Witness 3: "it's a bit better, mainly bc I do my damned best not to bring up triggers of my past life. It sucks that my past life—from before I even ever met him—is a thing but it is. He is seeing a therapist once a week though about it, so he is actually trying to fix it."

61.     Notwithstanding their turmoil, Jane Doe became engaged to her boyfriend in the beginning of 2014.[1]

## IV.     The Evolution of Jane Doe's Narrative Following Pressure from Her Jealous Boyfriend, and the Ensuing NANOGrav Complaint and Rumors.

62.     Jane filed a complaint of sexual assault and sexual harassment against John Doe with NANOGrav.

63.     Although the complaint was dated October 19, 2014, she did not submit her complaint to NANOGrav until March 2016.

64.     NANOGrav commenced an investigation on March 7, 2016.

65.     In the complaint, she described events that purportedly took place between her and John Doe from June 2011 to the Fall of 2012.

66.     The complaint was prompted by Jane Doe's desperate attempt to assuage her fiancé's insecurities, and salvage the engagement.

67.     Towards the end of 2014, a year after her jealous boyfriend started seeing a therapist to cope with Jane's sexual past, Jane started reinventing her sexual past. She began telling

---

[1] Witness 3 was a bridesmaid in Jane Doe's wedding in summer 2015. They are no longer friends as a result of Witness 3 disclosing messages between them during the NANOGrav and University investigations. In fact, Witness 3 was forced to report threats made by Jane Doe against her to the FBI.

her peers and other post-doctoral graduates (for the first time) that John Doe raped and harassed her.

68.     In March 2016, John Doe learned of these rumors from various NANOGrav management team members, including its then current chairperson. On or around August 2016, the chairperson told John Doe that other NANOGrav members expressed concerns about John's participation and continued presence in the collaboration.

69.     Jane's allegations aroused suspicion among NANOGrav members and caused John's further alienation from the collaboration. John's ability to meaningfully participate in the collaboration was thwarted.

70.     In a NANOGrav meeting on February 2016, John first discovered that he was "under investigation" by NANOGrav through happenstance; John was scheduled to introduce a scientist to the February 2016 meeting, but the chairperson of the organizing committee objected on the grounds that John was "under investigation."

71.     NANOGrav had no authority to investigate the complaint.

72.     In defense of Jane's claim that she was sexually assaulted or sexually harassed, John submitted numerous text messages between the two of them, and between Jane and Witness 3.

73.     NANOGrav summarized the findings of their investigation in a "Member Advocate Inquiry Report," dated May 3, 2016 ("NANOGrav Report").

74.     According to the NANOGrav Report, Jane Doe claimed that her relationship with John began and continued without her full consent. Jane stated that there was an imbalance of seniority in the relationship and John was in a position of power. NANOGrav concluded that Jane had not given—and was in no position to give—consent to sexual intercourse at the Conference in

June 2011, and that she was subjected to sexual harassment on at least one occasion where John caused her "significant embarrassment" by using the couple's private language in public. Contrary to the NANOGrav report, John was not aware of any time he caused Jane significant embarrassment, but rather being embarrassed himself by a misuse of private language in public.

75. The NANOGrav Report findings had no evidentiary support and did not reflect John's version of the events and gave no consideration to John's evidence. The NANOGrav investigator declined to review the evidence and numerous text messages submitted by John, which were written by Jane during their relationship. The investigator's refusal was based on the fact that he "did not want to embarrass Jane Doe" by reading the messages. Yet, there is no evidence that the investigator attempted to obtain Jane's permission to review the text messages either.

76. Notably, during NANOGrav's investigation, John was never given an opportunity to review Jane's complaint, and he was unable to meaningfully respond to her accusations during the process. As it turned out, Jane's complaint alleged that she had "mental difficulties" due, in part, to her relationship with John. Had John been allowed to review her allegations, he would have provided evidence of Jane's pre-existing mental difficulties when he met her and the emotional turmoil she endured with her husband before they got married in 2015.

77. NANOGrav concluded that John did not appreciate the imbalance of power in the relationship, or how it could cause Jane emotional and academic harm. NANOGrav determined that Jane Doe was "scarred" by her experiences as a NANOGrav member, and decided to leave the collaboration rather than attempt to work with John Doe and other male members. NANOGrav found that John Doe's inebriation in the presence of students and junior collaboration members demonstrated a lapse of judgment and caused discomfort to those around him.

78.     However, John had no supervisory or other control over Jane in NANOGrav or at the University. Also, Jane Doe never left NANOGrav and is still presently a member.

79.     Also, NANOGrav's culture included social drinking among junior and senior members; several professor-members of NANOGrav engaged in social drinking and romantic relationships with Ph.D. and even undergraduate students with impunity.

80.     Finally, the NANOGrav Report stated that on April 13, 2016 a third party lodged a formal complaint with the University about the same events, and that NANOGrav members were interviewed as part of the University process, and that they had a copy of the final NANOGrav report.

## V.     The University's Complaint Process.

80.     Five years after John and Jane's relationship began, and nearly three years after it concluded, the University received a complaint of sexual assault and sexual harassment based on the same allegations in the underlying NANOGrav complaint. However, the University complaint was not filed by Jane Doe. It was filed by Wiemer, Assistant Director of the Office of Equity and Diversity Services ("EDS") because "[Jane Doe] did not want to file a complaint herself."

81.     There is no justifiable reason for the University's investigation.

82.     John is not and was not ever employed in any capacity with the University.

83.     John did not and does not maintain any regular presence on campus. Indeed, John has only been to the University's campus on two occasions for short visits in the last decade; once in 2007 and once in 2014.

84.     John and Jane's relationship never took place on University property.

85.     Jane was no longer a student at the University.

86.     John was never one of Jane's professors and he never supervised Jane in any capacity.

87.     Accordingly, the University, an arm of the state, unlawfully exercised jurisdiction over John Doe in violation of his constitutional rights.

88.     Initially, John Doe declined to participate in the University's process because he was not an employee of the University, and not subject to its policies.  He was also undergoing great emotional difficulty at the time due to the recent and sudden loss of his father.

89.     After undergoing a biased investigation with NANOGrav where the investigator refused to review or consider exculpatory text message evidence, John sought assurances from the University that he would be provided with a meaningful or fair opportunity to be heard.  The University failed to provide any assurances.

90.     John retained counsel and, on the advice of counsel, invoked his Fifth Amendment right to silence to avoid any complications in the event that criminal charges were brought.[2]

91.     Ultimately, John believed the evidence and witnesses, once properly investigated, would support the consensual nature of their relationship.

92.     On October 10, 2016, Cortes, Interim Director of EDS, issued her investigation report and determination finding John Doe "responsible" for non-consensual sex and sexual harassment (the "University Report") for reasons similar to those cited in the NANOGrav Report.

---

[2] The Fifth Amendment privilege against compulsory self-incrimination "protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cnty.*, 542 U.S. 177, 190, 124 S. Ct. 2451, 2460-61, 159 L. Ed. 2d 292 (2004).

93. Cortes recommended that John have no contact with the University's students; that the University consider severing financial and academic ties with John; and/or take steps to strictly monitor and limit John's contact with the University's students ("Sanctions").

94. Notably, the University Report dismissed Witness 3's testimony about Jane's enthusiasm with John after their first night in June 2011, and her desire to continue seeing him for almost two years. Jane's repeated pursuit of John was demonstrated in her text messages to him almost two years later where she asked John to visit her in Wisconsin to meet her family. Yet, Jane lied to the University and stated that she never said those things. Jane also claimed that she "blacked out" in June 2011, but failed to submit any support for her claim. Moreover, Jane lied about her status in NANOGrav and claimed she had left the collaboration. As NANOGrav records can corroborate, Jane never left the collaboration and is still presently a member. Inexplicably, the University adopted Jane's self-serving statements over other overwhelming evidence, including from disinterested sources, and without any corroborating proof.

95. Upon information and belief, Cortes relied upon the NANOGrav Report in arriving at her findings in the University Report.

96. The University Report acknowledged that "[t]he Respondent is not a UWM employee," but EDS notes that if he were, it would be contrary to the professional standards UWM expects of its faculty and staff responsible for mentoring and guiding our students in their educational endeavors."

97. Since he was not an employee of the University, John Doe lacked any notice of how the University's policies could potentially apply to him.

98.     The University assumed jurisdiction over the complaint despite the mandate in the University's Discrimination Policy, Page 6, that complaints "*mus*t be filed within 300 calendar days of the most recent alleged prohibited act…." (emphasis added).

99.     The University attempted to circumvent the 300-day deadline by claiming that the University's Discrimination Policy allows the University to take complaints beyond the 300-day deadline for "good cause."

100.    The University falsely claimed that it took jurisdiction because "other University students may still interact with the Respondent during academic conferences and meetings."

101.    However, there was no basis for its claim that John would interact with other University students during academic conference and meetings.

102.    Also, Wis. Stat. § 36.12 grants authority to the Board to oversee disciplinary proceedings at the University.  Under the statute, all complaints must be filed within 300 days of the alleged violation.  There are no exceptions outlined in the statute.

103.    Moreover, the University acknowledged that its "investigation was hampered by the passage of time, and witnesses' inability to recall certain relevant details."

104.    At some point during the investigation, the University notified John's university that it was investigating him for sexual assault and sexual harassment.  As a result, John's employer opened a file to include the University Report as part of his personnel records.

105.    Coincidentally, the University is conducting a similar investigation against one of its own professors, also a member of NANOGrav, accused of similar charges with Witness 3, who was an undergraduate student at the time of the allegations.

**VI.    The University Appeal and Wrongful Determination.**

106.    After reviewing the University Report and aspects of the complaint presented therein for the first time, John Doe identified numerous falsehoods and fabrications submitted by

Jane. John was compelled to file an appeal to demonstrate his innocence and contest Jane's false statements. John also based his appeal on the University's lack of jurisdiction or authority to subject him to discipline.

107.    On October 24, 2016, John Doe submitted an appeal of the University Report.

108.    As he did with NANOGrav, John submitted numerous text messages between the two of them, and between Jane and Witness 3. The messages conveyed Jane's enthusiasm about John and desire to continue seeing John after their first evening of intimacy at the Conference. The messages also demonstrated Jane's intent to continue their relationship for almost two years, and take their relationship to the "next level".

109.    However, on November 22, 2016, UWM's Provost and Vice Chancellor for Academic Affairs, Johannes Britz, denied John Doe's appeal ("Appeal Decision").

110.    Upon his review of the Appeal Decision, John Doe learned that the University was focused on the circumstances of that first night in June 2011. Without acknowledging how the numerous text messages were relevant to disprove Jane's sexual harassment claim, the Appeal Decision stated that the messages failed to address Jane's sexual assault claim from their first night in June 2011. However, during the investigation and through the University Report, John Doe was led to believe that the University's investigation was based on John and Jane's long-term emotional and sexual relationship.

## VII.    The Aftermath at NANOGrav.

111.    Once NANOGrav was advised about the University Report and Appeal Decision, John Doe was shunned and pressured to voluntarily remove himself from the collaboration.

112.    Ironically, one of the management team members spearheading John's removal, a faculty member of the University, was advised that he was facing sexual assault allegations himself just days before the University's final decision against John. This management team

18

member's own conflicted status did not cause him to remove himself from continuing to insist on John's removal from NANOGrav.

113.    As a compromise, John Doe proposed a limited participation where he refrain from attending NANOGrav meetings, or take leadership positions, until his name is cleared.

114.    NANOGrav declined John Doe's counter-proposal, and initiated proceedings to involuntarily eject him from the collaboration.

115.    Currently, NANOGrav has agreed to halt John's ejectment pending a favorable result in this lawsuit. However, in the interim, NANOGrav has proscribed John's participation in the collaboration even further than the University's recommended Sanctions; John is prohibited from attending NANOGrav meetings, taking leadership positions, or participating in any meetings by telephone, videoconferencing, or in person.

## VIII.   The University's Wrongful Disclosure of Confidential Information.

116.    The University's Disciplinary Policy, page 11, states, "All individuals involved in the investigation and resolution of a complaint are expected to maintain the confidentiality of the complaint and resolution to the maximum extent possible under the circumstances. Certain disclosures, however, may be necessary to complete the investigation and/or resolution of the matter. In addition, all documents maintained by UWM are potentially subject to the provisions of the Wisconsin open records law."

117.    On April 27, and on April 28, 2016, Cortes advised John's employer, by telephone and email, of the University's intent to investigate the allegations of sexual assault and sexual harassment against John Doe.

118.    Subsequently, on or about October 2016, Cortes provided John's employer with a copy of the University Report, which contained the University's decision finding John "responsible" of sexual harassment and sexual assault.

19

119.    Subsequently, the Provost of John's employer initiated an internal investigation and demanded all pertinent documents and information related to the findings. The Provost requested that John keep him apprised of all developments regarding his case.

120.    John's employment with his university has been placed in jeopardy and his reputation has been irreparably harmed. So far, John's employer has limited John's ability to hire staff for his department. Upon information and belief, John's employer has withheld a valuable director stipend from John as a result of the University's findings. The stipend was worth $40,000 per year.

121.    Moreover, the University unlawfully shared the outcome of the erroneous Appeal Decision with NANOGrav. John Doe's position with NANOGrav has been irreparably compromised. John has been threatened with ejectment from the collaboration, his reputation has been tarnished, and his academic work and research has been compromised. Due to the University's unlawful disclosure, John has lost numerous collaborators and future collaborations are compromised.

## IX.    John Doe's Future Has Been Damaged by the University's Actions.

122.    As a result of the actions by the University, John Doe has sustained tremendous damages to his reputation, threatened loss of employment, and financial damages due to compromised grants or future grant participation.

123.    John Doe's ability to secure funding from a $1,000,000 sub-award from the University has been completely compromised. The sub-award would have included $24,000 in supplemental salary to John.

124.    John's ability to obtain future grants was also compromised when the National Science Foundation (NSF) was made aware of the existence of the charges, allegations, and the University's outcome finding John "responsible" of sexual harassment and sexual assault. NSF

reported the existence of the charges to the U.S. Department of Education. The NSF grant would have included $600,000 in supplemental salary over John Doe's active career.

125. John Doe has sustained damages to his reputation with NANOGrav. His active participation in NANOGrav is essential to his standing in the science community. The curtailment of John's meaningful participation in the collaboration will cause him further damages to his career.

126. Currently, John is still under scrutiny by his employer. His standing at the university that employs him has already been compromised, and his continued employment remains at risk of termination.

127. John Doe seeks redress from this Court to undo the wrongs occasioned by the Defendants.

**AS AND FOR A CAUSE OF ACTION**
**(Violation of Procedural and Substantive Due Process Rights Pursuant to 42 U.S.C. § 1983)**
***(Against All Defendants)***

128. John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

129. The Fourteenth Amendment of the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law."

130. The Fourteenth Amendment's due process protections are required in higher education disciplinary decisions, including the disciplinary decisions issued under the University's policies.

131. The Due Process Clause forbids arbitrary deprivations of liberty where one's good name, reputation, honor, or integrity is at stake because of the government's actions.

132.    The Due Process Clause also demands that a state taking action against a citizen have jurisdiction over said citizen.

133.    A finding of misconduct by an educational institution can have a substantial, life-long impact on one's professional life, personal life, and reputation.

134.    Due process requires that an individual facing serious charges of misconduct and exposure to substantial sanctions is entitled to receive notice and a fundamentally fair hearing and/or process.

135.    Given his involuntary participation in the process (due to the complete absence of jurisdiction over him), John Doe was entitled to a meaningful right to be heard in his own defense and to be present and present evidence on his behalf pursuant to the Due Process clause of the United States Constitution.

136.    Due process requires that no serious disciplinary action be taken against an individual unless it is based upon substantial evidence.

137.    John Doe has a protected interest in his good standing and reputation.

138.    The University has an obligation to perform a fundamentally fair and reliable investigation and adjudication process.

139.    Defendants' actions deprived John Doe of his liberty in unjustly damaging his reputation, which, if not corrected, will have a life-long impact on his professional and personal life.

140.    At all relevant times, Defendants acted under color of state law.

141.    Wiemer filed a third-party complaint of sexual harassment and sexual assault against John without standing.

142. Wiemer filed a third-party complaint of sexual assault and sexual harassment against John with the University after the 300-day deadline expired.

143. Defendants exercised jurisdiction over John in the absence of statutory authority to do so, and in violation of John's constitutionally protected interests.

144. John has no meaningful connections with the University.

145. John has no meaningful connections with the State of Wisconsin.

146. John was not affiliated with the University or employed with the University.

147. Jane was not a student at the University at the time of the complaint.

148. None of the events at issue occurred at, or related to, the University.

149. John never consented to be subjected to the University's policies.

150. John had no notice that he would be subjected to the University's policies.

151. The University acknowledged that the belated complaint hampered the fact-finding process, which deprived John of a meaningful opportunity to be heard.

152. The University's findings disregarded relevant, overwhelming evidence that vitiated Jane Doe's credibility about her claims, and were arbitrary and capricious.

153. Cortes investigated and facilitated the wrongful determination against John Doe in a manner that deprived him of his constitutionally protected rights, without due process.

154. Britz denied John's appeal, notwithstanding the University's procedural failures and the evidentiary weaknesses of the complaint.

155. By reason of the foregoing, John Doe requests, that this Court issue preliminary and permanent injunctive relief: (1) to vacate the University's decisions regarding Jane's complaint of sexual assault and sexual harassment; (2) restrain the University from making any adverse disciplinary notation regarding John; (3) restrain the University from retaining any record

related to John's disciplinary process; and (4) restrain the University from reporting any record of John's disciplinary process in response to third party inquiries.

156.     Pursuant to 42 U.S.C. §§ 1983 and 1988, John Doe is entitled to recover the costs of this lawsuit, including his reasonable attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment against the Defendants as follows:

A.     On the cause of action for violation of due process rights under 42 U.S.C. § 1983, John Doe requests that this Court issue preliminary and permanent injunctive relief: (1) to vacate the University's decisions regarding Jane's complaint of sexual assault and sexual harassment; (2) restrain the University from making any adverse disciplinary notation regarding John; (3) restrain the University from retaining any record related to John's disciplinary process; and (4) restrain the University from reporting any record of John's disciplinary process in response to third party inquiries;

B.     Issue a stay or enjoin the University's decision on the basis of the University's lack of jurisdiction;

C.     Award John Doe attorneys' fees;

D.     Review and reverse the University's decision on the basis that it was arbitrary and capricious;

E.     Grant judgment in favor of the John Doe; and

F.     Award John Doe such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff, John Doe herein demands a trial by jury of all triable issues in the present matter.

24

Dated this 16th day of March, 2018.

_s/Christopher M. Meuler_
Christopher M. Meuler (WI SBN: 1037971)
Friebert, Finerty & St. John, S.C.
330 East Kilbourn Avenue, Suite 1250
Milwaukee, WI 53202
T: 414-271-0130
F: 414-272-8191
E: cmm@ffsj.com

Kimberly C. Lau, Esq. (_admission application to be filed_)
John E. Greene, Esq. (_admission application to be filed_)
Warshaw Burstein, LLP
555 Fifth Avenue
New York, NY 10017
T: 212-984-7709
E: klau@wbny.com

_Attorneys for Plaintiff, John Doe_